IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

CODING TECHNOLOGIES, LLC,

      Plaintiff,

    v.

COLD STONE CREAMERY, INC.,

      Defendant.

No. 2:18-cv-251-JRG-RSP

PATENT CASE

JURY TRIAL DEMANDED

**COLD STONE CREAMERY'S RULE 12(b)(3) MOTION TO DISMISS FOR IMPROPER
VENUE AND, IN THE ALTERNATIVE, RULE 12(b)(6) MOTION TO
DISMISS FOR FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

Page(s)

I.      STATEMENT OF THE ISSUES............................................................................ 2

II.     NATURE AND STAGE OF THE PROCEEDINGS ........................................... 2

III.    COLD STONE CREAMERY'S RULE 12(b)(3) MOTION TO DISMISS .......... 3

        A.      Venue Allegations.........................................................................................3

        B.      Legal Standard ..............................................................................................3

        C.      Venue Is Improper In This Judicial District ................................................4

IV.     COLD STONE CREAMERY'S RULE 12(b)(6) MOTION TO DISMISS .......... 5

        A.      The '159 Patent.............................................................................................5

        B.      Legal Standard ..............................................................................................9

                1.      This Case Should Be Disposed of at the Pleading Stage
                        Through Rule 12(b)(6).......................................................................9

                2.      The Law of 35 U.S.C. § 101 ...........................................................10

        C.      The '159 Patent is Invalid under 35 U.S.C. § 101.....................................11

                1.      *Alice* Step 1 ...................................................................................12

                2.      *Alice* Step 2 ...................................................................................17

                3.      The Remaining Claims Are Also Abstract .....................................21

        D.      The Disproportionate Risk of Preemption Confirms that the Claims
                Are Abstract ................................................................................................22

V.      CONCLUSION.................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014) .................................................................................................. *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................................9

*Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*,
687 F.3d 1266 (Fed. Cir. 2012) ........................................................................10, 13, 19, 20

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ............................................................................................20

*Bilski v. Kappos*,
561 U.S. 593 (2010) ...................................................................................................10, 11, 12

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014) ............................................................................................19

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014) .................................................................................. *passim*

*Cuvillier v. Sullivan*,
503 F.3d 397 (5th Cir. 2007) ...........................................................................................9, 10

*Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*,
558 F. App'x 988 (Fed. Cir. 2014) .......................................................................................17

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011) ............................................................................................11

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ............................................................................................18

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980) ...............................................................................................................10

*Diamond v. Diehr*,
450 U.S. 175 (1981) ...............................................................................................................11

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ......................................................................................18, 19

*Fort Props., Inc. v. Am. Master Lease LLC*,
671 F.3d 1317 (Fed. Cir. 2012) ............................................................................................11

*Fourco Glass Co. v. Transmirra Products Corp.*,
353 U.S. 222 (1957) .............................................................................................................4, 5

*Hamilton v. United Parcel Serv., Inc.*,
No. 1:11–CV–240, 2012 WL 760714 (E.D. Tex. Feb. 13, 2012) ...........................................4

*Intellectual Ventures I LLC v. Capital One Bank U.S.A.*,
   792 F.3d 1363 (Fed. Cir. 2015)..............................................................................................20

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   850 F.3d 1332 (Fed. Cir. 2017 ..............................................................................................16

*Internet Patents Corp. v. Active Network, Inc.*,
   790 F.3d 1343 (Fed. Cir. 2015)..................................................................................14, 17, 21

*Laserdynamics Inc. v. Acer Am. Corp.*,
   209 F.R.D. 388 (S.D. Tex. 2002...............................................................................................4

*L & H Concepts LLC v. Schmidt*,
   No. 6:07-CV-65, 2007 WL 4165259 (E.D. Tex. Nov. 20, 2007)............................................4

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*,
   66 F. Supp. 3d 829 (E.D. Tex. 2014).....................................................................................22

*Lovelace v. Software Spectrum*,
   78 F.3d 1015 (5th Cir. 1996) ...................................................................................................9

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012)......................................................................................................11, 21

*Morales v. Square, Inc.*,
   75 F. Supp. 3d. 716 (W.D. Tex. 2014), *aff'd*, 621 F. App'x 660 (Fed. Cir.
   2015), *cert. denied*, 136 S. Ct. 1461 (2016)........................................................................12

*Parker v. Flook*,
   437 U.S. 584 (1978)................................................................................................................11

*Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*,
   No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938 (E.D. Tex. Mar. 8, 2017) ............................12

*Recognicorp, LLC v. Nintendo Co., Ltd.*,
   855 F.3d 1322 (Fed. Cir. 2017)..................................................................................15, 16, 19

*Secured Mail Solutions LLC v. Universal Wilde, Inc.*,
   873 F.3d 905 (Fed. Cir. 2017)....................................................................................16, 17, 19

*Schnell v. Peter Eckrich & Sons, Inc.*,
   365 U.S. 260 (1961)..................................................................................................................4

*TC Heartland v. Kraft Foods Grp. Brands LLC*,
   137 S. Ct. 1514 (2017)......................................................................................................1, 3, 5

*In re TLI Commc'ns LLC Patent Litig.*,
   823 F.3d 607 (Fed. Cir. 2016)................................................................................................19

*Ultramercial, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014) (Mayer, J., concurring)..............................................10, 13, 17

**Statutes**

35 U.S.C. § 101..................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)........................................................................................................ *passim*

Pursuant to Rule 12(b)(3) of the Federal Rule of Civil Procedure and 28 U.S.C. § 1406(a), Cold Stone Creamery respectfully requests that this Court dismiss all claims in Coding Technologies' Complaint for improper venue. Coding Technologies' Complaint, if taken as true, does not establish venue under 28 U.S.C. § 1400(b). Cold Stone Creamery does not "reside" in this judicial district because its principal place of business is not located here, and Coding Technologies has not plausibly alleged that any acts of infringement through "internal testing" have occurred in this District. Venue is therefore improper pursuant to the Supreme Court's ruling in *TC Heartland v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514 (2017).

If this Court finds that venue is proper, Cold Stone Creamery respectfully requests that this Court dismiss all claims in Coding Technologies' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil procedure for failure to state a claim upon which relief can be granted. The claims of U.S. Patent No. 8,540,159 (the "'159 Patent") are directed to the abstract idea of data recognition and retrieval. But data recognition and retrieval, like recognizing and retrieving information associated with a bar code, is not a technological improvement, an inventive way of applying conventional technology, or even new (as the specification acknowledges).

Moreover, none of the claims recites any specific hardware or software. Instead, the specification discloses only that the alleged invention uses off-the-shelf computer components and devices like a "mobile phone," a "scanner," and a "server" to perform conventional activities like "processing," "decoding," "transmitting," and "receiving" information. The '159 Patent does no more than withdraw a basic idea (data recognition and retrieval) from the public domain without disclosing any particularized application of that idea. Therefore, the '159 Patent is invalid under 35 U.S.C. § 101 for failure to claim patent-eligible subject matter.

Resolving these issues does not require discovery or formal claim construction. To avoid waste of judicial and party resources unnecessarily litigating an invalid patent, Cold Stone Creamery thus requests that the Court dismiss the Complaint.

## I.    STATEMENT OF THE ISSUES

1.    Venue in patent cases is governed solely by 28 U.S.C. § 1400(b), which establishes that "[a]ny civil action for patent infringement may be brought in the judicial district [i] where the defendant resides, or [ii] where the defendant has committed acts of [alleged] infringement and has a regular and established place of business." Cold Stone Creamery does not reside in this judicial district, and Coding Technologies has not alleged any plausible facts that Cold Stone Creamery has committed acts of infringement here. Should the Court therefore dismiss Coding Technologies' Complaint pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406(a) for improper venue?

2.    Abstract ideas are ineligible for patentability under 35 U.S.C. § 101, absent an inventive concept that amounts to significantly more than the abstract idea. The '159 Patent is directed to the abstract idea of data recognition and retrieval. The '159 Patent does not include an inventive concept beyond that idea. Should the Court therefore dismiss Coding Technologies' Complaint pursuant to Rule 12(b)(6) for failure to state a claim?

## II.    NATURE AND STAGE OF THE PROCEEDINGS

On June 13, 2018, Coding Technologies filed this lawsuit accusing Cold Stone Creamery of infringing claims 1, 2, 3, 8, 9, 10, 15, and 16 of the '159 Patent through Cold Stone Creamery's alleged "internal use and testing" of a Quick Response ("QR") code to download the Cold Stone Creamery mobile application:



Dkt. No. 1 ("Compl.") ¶ 14.

## III.   COLD STONE CREAMERY'S RULE 12(b)(3) MOTION TO DISMISS

### A.   Venue Allegations

In its Complaint, Coding Technologies pleads only general and unsupported allegations

that venue is proper in this District:

> On information and belief, venue is proper in this District under 28 U.S.C. §
> 1400(b) because acts of infringement are occurring in this District and Defendant
> has a regular and established place of business in this District. For example, on
> information and belief, Defendant has a regular and established place of business
> at 190 E Stacy Rd, Allen, TX 75002. On information and belief, Defendant has
> other regular and established places of business in this District.

Compl. ¶ 7. Coding Technologies makes no plausible allegation that any purported infringement

through "internal use and testing" occurred in this judicial district. *Id.* ¶¶ 7, 14.

### B.   Legal Standard

On May 22, 2017, the Supreme Court issued its decision in *TC Heartland*, holding that

venue in patent cases is governed solely by 28 U.S.C. § 1400(b), which establishes that "[a]ny

civil action for patent infringement may be brought in the judicial district [i] where the defendant

resides, or [ii] where the defendant has committed acts of [alleged] infringement ***and*** has a regular

and established place of business." *TC Heartland*, 137 S. Ct. at 1514 (emphasis added). "The

requirement of venue is specific and unambiguous; it is not one of those vague principles which, in the interest of some overriding policy, is to be given a 'liberal' construction." *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 264 (1961). In *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 226 (1957), the Supreme Court concluded that for purposes of § 1400(b) a domestic corporation "resides" only in its State of incorporation.

Once a defendant raises a 12(b)(3) motion to dismiss for improper venue, the burden of sustaining venue lies with the plaintiff. *L & H Concepts LLC v. Schmidt*, No. 6:07-CV-65, 2007 WL 4165259, at *1 (E.D. Tex. Nov. 20, 2007) (citing *Laserdynamics Inc. v. Acer Am. Corp.*, 209 F.R.D. 388, 390 (S.D. Tex. 2002)). "Whenever an action could not have been properly brought in a district and no reason appears why it would be more in [the] interest of justice for [the] court to transfer [the] case than to dismiss it, it should be dismissed pursuant to 28 U.S.C. § 1406(a)." *Hamilton v. United Parcel Serv., Inc.*, No. 1:11–CV–240, 2012 WL 760714, at *2 (E.D. Tex. Feb. 13, 2012).

### C.   Venue Is Improper In This Judicial District

Plaintiff has not carried its burden to show that venue is proper in this District. Cold Stone Creamery does not "reside" in this judicial district under the first prong of § 1400(b) because it is incorporated in Arizona and has its principal place of business located in Scottsdale, Arizona. Decl. of Kimberly Lane (attached as **Ex. A**) ¶ 3; LexisNexis Arizona Secretary of State Corporate Filing (attached as **Ex. B**); *see also Fourco Glass Co.*, 353 U.S. at 226. The only bare fact that Coding Technologies presented in its Complaint relates to the second prong of § 1400(b); that Cold Stone Creamery has a place of business located in Allen, Texas. Compl. ¶ 7. But Coding Technologies failed to allege that any purported infringement through "internal use and testing" occurred in this District. 28 U.S.C. § 1400(b) ("*where the defendant has committed acts of infringement* and has a regular and established place of business") (emphasis added). Cold Stone Creamery does not

conduct "its general business" in this judicial district. **Ex. A** ¶¶ 4, 6. Nor does Cold Stone Creamer "internally use or test" the accused QR codes here. *Id.* ¶ 7.

Thus, as Coding Technologies failed to allege any specific facts under the recently-clarified *TC Heartland* standard (in light of *Fourco*) that could support proper venue in this District, Coding Technologies' Complaint should be dismissed under Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406(a).

## IV.   COLD STONE CREAMERY'S RULE 12(b)(6) MOTION TO DISMISS

### A.   The '159 Patent

The '159 Patent issued on September 24, 2013, and is entitled "Method for Providing Mobile Service Using Code Pattern." Compl. ¶ 11. Of the eight asserted claims, four are independent (claims 1, 8, 15, 16), and four are dependent (claims 2, 3, 9, 10). The asserted claims are generally directed to methods for retrieving website information on a mobile device by "decoding" a "code pattern" (e.g., bar code or QR code) to obtain a website address (e.g., a URL).

The applicants noted that "mobile terminals have been widely used" and that "various mobile services using mobile terminals are being developed." '159 Patent at 1:29-31. They further noted that accessing information on a website using a URL was common. *Id.* at 1:36-38 ("[I]t has been common that companies, which have their own websites, provide their URL information along with product information in advertising their products . . . ."). And the applicants acknowledged that they did not invent the concept of recognizing and retrieving information associated with a code pattern like a bar code or a QR code. *Id.* at 11:1-15. Indeed, the specification describes that "a bar code has been extensively used in many places, such as retail stores and book stores" (*id.* at 2:5-6), and that "obtaining certain information from a code pattern" was in the prior art (*id.* at 2:12-15). The applicants noted, however, that "there are still needs for a new mobile service to provide various content more conveniently and to allow users to use various services

more easily." *Id.* at 1:32-35. Their concern was thus to provide a user "convenient" access to a company's website by obtaining a URL "more easily."

Claim 1, set forth below, is representative of the claims:

1. A method of providing content with the use of a code pattern by a user terminal, the method comprising:

obtaining a photographic image of a code pattern by a camera of the user terminal;

processing, by a processor of the user terminal, the photographic image of the code pattern to extract the code pattern from the photographic image;

decoding the extracted code pattern by the processor of the user terminal into code information;

transmitting a content information request message to a server based on the code information; and

receiving content information from the server in response to the content information request message.

*Id.* at cl. 1.

Claim 1 can be broken down into five main steps: (1) capturing an image with a camera of a "user terminal" (i.e., taking a photograph); (2) processing the captured image with a "processor" (i.e., recognizing the image in the photograph and converting the image to a digital format); (3) decoding information extracted from the captured image by the "processor" (i.e., reading digital information, like a URL, from the digital image); (4) sending a request to a "server" based on the decoded information (i.e., requesting a webpage based on the URL); and (5) receiving information from the "server" in response (i.e., rendering the webpage). Put simply, claim 1 is directed to recognizing and retrieving information associated with a pattern.

The applicants made clear through their own language in the specification that the components for carrying out the claimed method are nothing more than generic computing and

networking elements. For example, the claimed "user terminal" can be virtually any computer or mobile device capable of taking a photograph. *Id.* at 8:47-50 ("A wireless communication terminal, such as a mobile phone, a Personal Communications Service (PCS) and a Personal Digital Assistant (PDA), can be used as the user terminal 10."); *id.* at 8:61-63 ("Further, a Personal Computer (PC) or a notebook computer, as well as a mobile terminal, can be used as the user terminal 10.").

The claimed "processor" that "process[es] . . . the photographic image of the code pattern to extract the code pattern from the photographic image" is presumably the "photographing unit 11" depicted in Figure 3, which simply "functions to recognize (or photograph) the barcode 60, convert recognized (photographed) analog image data into digital image data, and transmit the digital image data to the decoder 13 in the present invention." *Id.* at 10:8-13.



*Id.* at Fig. 3. No details are provided either in the claims or the specification as to how the photograph is converted from analog image data to digital image data. Nor is any specialized equipment required. Instead, the "photographing unit 11" can be "[a] scanner, a PC camera, a digital camera, a Web camera *or the like*." *Id.* at 10:14-17 (emphasis added).

The claimed "processor" that "decod[es] the extracted code pattern . . . into code information" is presumably the "decoder 13" in Figure 3, which simply "functions to analyze digital image data received from the photographing unit 11 and extract code information from the analyzed digital image data." *Id.* at 10:18-20. No specialized equipment or programming is

required or disclosed in either the claims or specification. Instead, the specification states only that "[t]he decoder 13 can be implemented with a one-dimensional or two-dimensional code recognizer depending on the type of the barcode 60." *Id.* at 10:20-23.

The "code information" (i.e., the web page address information or URL) is then "transmitted" to the service provider server along with the "content information request." *Id.* at 2:45-47. Content information (i.e., the webpage) is then received at the user terminal from the service provider server. *Id.* at 2:47-49. The service provider server of the asserted claims[1] performs the basic functions of a web server and must only be capable of receiving information, like a URL, and rendering a webpage. *Id.* at 8:64-9:5 ("The service provider server 130 is a computer provided in a service provider that provides the content providing service of the present invention, and functions to extract corresponding content and transmit the content to the user terminal 10 . . . and transmit the Web page information to the user terminal 10, if a content request message is received from the user terminal 10 through the communication network 20.").

Figure 5, depicted below, shows "a flowchart of a content providing method using a barcode according to the first embodiment of the present invention":

---

[1] In the nonasserted claims, the service provider server also retrieves information from a database. '159 Patent at cls. 4, 5, 6, 7, 11, 12, 13, 14, and 17.



*Id.* at 11:47-50 and Fig. 5. No details are provided as to how the system functions to decode an image or extract URL information. *Id.* at 7:14-19. In other words, Figure 5 (and the '159 Patent itself) merely describes a basic flowchart involving processing an image (like a barcode) and retrieving information about that image.

### B.    Legal Standard

#### 1.    This Case Should Be Disposed of at the Pleading Stage Through Rule 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss a complaint that fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007) (internal citations and quotations omitted). In deciding a Rule 12(b)(6) motion, courts consider documents attached to or incorporated into the complaint as well as facts alleged in the complaint. *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1017 (5th Cir. 1996). Although factual allegations are taken as true, legal conclusions are given no deference—those matters are left for the court to decide. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting tenet that allegations are taken as true on a motion to dismiss "is inapplicable to legal conclusions"). "[W]hen

the allegations in a complaint, however true, could not raise a claim of entitlement to relief [as a matter of law], this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier*, 503 F.3d at 401 (internal citations and quotations omitted).

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Accordingly, the § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718-19 (Fed. Cir. 2014) (Mayer, J., concurring). In those situations, claim construction is not required to conduct a § 101 analysis. *Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101.").

### 2. The Law of 35 U.S.C. § 101

Section 101 of the Patent Act sets forth four categories of patentable subject matter: "any new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. Also, the law recognizes three exceptions to patent eligibility: "laws of nature, physical phenomena, and ***abstract ideas***." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980) (emphasis added). Abstract ideas are ineligible for patent protection because a monopoly over these ideas would preempt their use in all fields. *See Bilski*, 561 U.S. at 611-12. In other words, "abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." *Id.* at 653 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

Determining whether a patent claim is impermissibly directed to an abstract idea involves two steps. First, the court determines "whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). Second, if the

claim contains an abstract idea, the court evaluates whether there is "an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal quotations and citations omitted).

Transformation into a patent-eligible application requires "more than simply stating the abstract idea while adding the words 'apply it.'" *Id.* at 2357 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012)). Indeed, if a claim could be performed in the human mind, or by a human using pen and paper, it is not patent-eligible. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011). Also, a claim is not meaningfully limited if it includes only token or insignificant pre- or post-solution activity—such as identifying a relevant audience, category of use, field of use, or technological environment. *Mayo*, 132 S. Ct. at 1297-98, 1300-01; *Bilski*, 561 U.S. at 610; *Diamond v. Diehr*, 450 U.S. 175, 191-92 & n.14 (1981); *Parker v. Flook*, 437 U.S. 584, 595 n.18 (1978). Finally, "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Mayo*, 132 S. Ct. at 1300; *see also Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323 (Fed. Cir. 2012) ("Such a broad and general limitation does not impose meaningful limits on the claim's scope.").

**C.    The '159 Patent is Invalid under 35 U.S.C. § 101.**

Coding Technologies' Complaint should be dismissed. The claims of the '159 Patent are invalid under 35 U.S.C. § 101 because they fail both prongs of the *Alice* test. Each of the claims is directed to the abstract idea of data recognition and retrieval. Abstract ideas are not eligible for patenting. None of the claims contains an "inventive concept sufficient to ensure that the patent in practice amounts to ***significantly more*** than a patent upon the ineligible concept itself." *See Alice*, 134 S. Ct. at 2355 (emphasis added). Because Coding Technologies has failed to state a claim

upon which relief may be granted, Cold Stone Creamery respectfully requests that the Court grant its motion and dismiss this case with prejudice. Fed. R. Civ. P. 12(b)(6).

        1.    ***Alice* Step 1**

In determining patent eligibility under § 101, the Court must first determine whether the claims are directed to an abstract idea. *Alice*, 134 S. Ct. at 2355. Under any plausible reading, the claims of the '159 Patent are directed to an unpatentable, abstract idea because they claim nothing more than the "longstanding," "routine," and "conventional" concept of data recognition and retrieval. *See Alice*, 134 S. Ct. at 2356; *Bilski*, 561 U.S. at 611.

        (a)    **Claim 1 of the '159 Patent is directed to the abstract idea of data recognition and retrieval.**

Claim 1 of the '159 Patent is representative of the claims.[2] *See, e.g.*, *Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*, No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938, at *8-9 (E.D. Tex. Mar. 8, 2017) (invalidating 974 claims after analyzing only a few "representative claims" where the other claims were "substantially similar" and "linked to the same abstract idea."). In assessing whether this claim is directed to an abstract idea, the Court must look past the claim language for the purpose of the claim to determine what the invention is trying to achieve. *Morales v. Square, Inc.*, 75 F. Supp. 3d 716, 725 (W.D. Tex. 2014), *aff'd*, 621 F. App'x 660 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 1461 (2016). All Claim 1 is "trying to achieve" is a "convenient" way to obtain a URL in order to access a website, consisting of nothing more than a set of basic ideas like retrieving, processing, decoding, and sending data:

---

[2] Where claims are "substantially similar and linked to the same abstract idea," courts may look to representative claims in a § 101 analysis. *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014).

| Claim Language | Claimed Idea |
|---|---|
| A method of providing content with the use of a code pattern by a user terminal, the method comprising: | |
| obtaining a photographic image of a code pattern by a camera of the user terminal; | Retrieving data |
| processing, by a processor of the user terminal, the photographic image of the code pattern to extract the code pattern from the photographic image; | Processing data |
| decoding the extracted code pattern by the processor of the user terminal into code information; | Decoding data |
| transmitting a content information request message to a server based on the code information; and | Sending data |
| receiving content information from the server in response to the content information request message. | Receiving data |

At a high level, this claim describes the most generic functional steps of a standard computer (i.e., sending, receiving, processing, and decoding data). Such a broad concept is not patent eligible because it "recite[s] an abstraction—an idea, having no particular concrete or tangible form." *Ultramercial*, 772 F.3d at 715. That the claim purports to implement the steps with conventional components like a "user terminal," a "processor," and a "server" does not make it any less abstract.

The specification admits that recognizing and retrieving information associated with a pattern like a barcode was a routine, well-known task at the time of the invention. '159 Patent at 2:5-15. The purported problem the applicants wanted to resolve was to provide a user "convenient" access a company's website by obtaining a URL "more easily." *Id.* at 1:32-35. But performing a task more efficiently does not confer patent eligibility. *See Bancorp*, 687 F.3d at 1279 ("Using a computer to accelerate an ineligible mental process does not make that process patent-eligible."). Moreover, the applicants failed to disclose the details of how to achieve such "convenient" access and instead describe the system only at a high level of generality—that is, the claims cover only

13

the resulting system the applicants envisioned, not how to implement it, much less how to do so in any non-conventional manner. *See Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (concluding that claim not directed to patent-eligible subject matter where "[t]he mechanism for maintaining the state is not described, although this is stated to be the essential innovation."). For example, the specification indicates that the image can be converted into digital data using a generic "scanner, a PC camera, a digital camera, a Web camera or the like" ('159 Patent at 10:14-17), and the image can be "decoded" using a generic "one-dimensional or two-dimensional code recognizer depending on the type of the barcode 60" (*id.* at 10:20-23). No further details are provided. A patent may not claim a result, stripped of any application or implementation to achieve that result.

### (b)   Similar claims have been found to constitute patent-ineligible subject matter.

Courts have found similar patent claims to be ineligible. In *Content Extraction*, the claims generally recited "a method of 1) extracting data from hard copy documents using an automated digitizing unit such as a scanner, 2) recognizing specific information from the extracted data, and 3) storing that information in a memory." *Content Extraction*, 776 F.3d at 1345. The claimed method "could be performed by software on an automated teller machine (ATM) that recognizes information written on a scanned check, such as the check's amount, and populates certain data fields with that information in a computer's memory." *Id.* The Federal Circuit concluded in *Alice*'s first step that the claims were "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory," or, put simply: "data recognition and storage." *Id.* at 1347. In rejecting the plaintiff's argument that the claims were not abstract because they required the use of a scanner, the Federal Circuit likened the claims to those found abstract in *Alice*, which "also required a computer that processed streams of

bits." *Id.* Like the *Content Extraction* claims, claim 1 of the '159 Patent is abstract because it simply "collect[s] data" (obtains an image) and "recogniz[es] certain data within the collected data set" (decodes the image to obtain a URL). *See id.* The claims in *Content Extraction* were directed to data recognition and *storage*, whereas the claims of the '159 Patent are directed to data recognition and *retrieval*—the former claims stored the recognized data, while the latter claims retrieve additional data based on the recognized data.

In *Recognicorp*, the Federal Circuit found the patent claim at issue to be directed toward the abstract idea of "encoding and decoding image data." *Recognicorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1324 (Fed. Cir. 2017). The claim at issue in *Recognicorp* recited:

> 1. A method for creating a composite image, comprising:
>
>> displaying facial feature images on a first area of a first display via a first device associated with the first display, wherein the facial feature images are associated with facial feature element codes;
>>
>> selecting a facial feature image from the first area of the first display via a user interface associated with the first device,
>>
>> wherein the first device incorporates the selected facial feature image into a composite image on a second area of the first display, wherein the composite image is associated with a composite facial image code having at least a facial feature element code and wherein the composite facial image code is derived by performing at least one multiplication operation on a facial code using one or more code factors as input parameters to the multiplication operation; and
>>
>> reproducing the composite image on a second display based on the composite facial image code.

*Id.* The Federal Circuit described the claim as a "method whereby a user displays images on a first display, assigns image codes to the images through an interface using a mathematical formula, and then reproduces the image based on the codes." *Id.* at 1326. The Federal Circuit found that this method reflected "standard encoding and decoding." *Id.*

The Federal Circuit then explained that encoding and decoding data is "an abstract concept long utilized to transmit information." *Id.* (citing *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340-41 (Fed. Cir. 2017) (organizing, displaying, and manipulating data encoded for human- and machine-readability is directed to an abstract concept)). The Federal Circuit provided several examples of long-utilized methods of encoding and decoding of data to transmit information: "Morse code, ordering food at a fast food restaurant via a numbering system, and Paul Revere's 'one if by land, two if by sea' signaling system all exemplify encoding at one end and decoding at the other end." *Id.* Claim 1 of the '159 Patent likewise simply decodes an image to obtain information, an abstract concept.

Additionally, in *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017), the Federal Circuit found claims directed to encoding and decoding a QR code invalid under both *Alice* steps. The *Secured Mail* claims "provide[d] a method whereby a barcode is generated, affixed to a mail object, and sent through the mail system [and t]hen, upon receipt, the barcode is scanned, and data corresponding to the sender is sent to the recipient over the network and displayed on the recipient's device" *Id.* at 910-11. The Federal Circuit found that "each step of the process is directed to the abstract process of communicating information about a mail object using a personalized marking." *Id.* at 911. And because the claims were "non-specific and lack[ed] technical detail," utilizing "well-known" technologies and generic hardware, the Federal Circuit concluded that the claims lacked an inventive concept. *Id.* at 912.

The idea underlying claim 1 of the '159 Patent is just as abstract as that of the *Content Extraction*, *Recognicorp*, and *Secured Mail* claims. Claim 1 does not include any specific limitations or steps regarding extracting data or decoding the data. Rather, all of the steps required to carry out the method are directed to the generic, conventional ideas of recognizing an image,

decoding the image, and then doing something based upon the decoded information. *See Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014) (finding claim directed to "the well-known concept of categorical data storage, i.e., the idea of collecting information in classified form, then separating and transmitting that information according to its classification, is an abstract idea that is not patent-eligible"). That claim 1 sends and receives the decoded information over a network does not make it any less abstract. *See, e.g.*, *Ultramercial*, 772 F.3d at 716 (noting that "the use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101") (citation omitted).

By only claiming the desired result—recognizing and retrieving information associated with a pattern like a barcode—without describing any specific roadmap for doing so, claim 1 of the '159 Patent falls short of claiming eligible subject matter under § 101. *See Internet Patents*, 790 F.3d at 1348; *Secured Mail*, 873 F.3d at 910-11.

## 2. *Alice* Step 2

Because claim 1 is directed to an abstract idea, the Court must next determine whether it contains an "inventive concept sufficient to transform the claimed abstract idea into a patent eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotations omitted). To pass this test, claim 1 "must include additional features" that "must be more than well-understood, routine, conventional activity." *Ultramercial*, 772 F.3d at 715 (quotation omitted). Here, claim 1 is broadly generic and does not contain meaningful limitations that would restrict it to a non-routine, specific application of the abstract idea.

### (a) Claim 1 contains no inventive concept to transform the abstract idea into patent-eligible subject matter.

Although the stated goal of the '159 Patent is to provide a "convenient" way for users to access a company's website ('159 Patent at 1:32-35), not a single technical improvement is

17

disclosed, much less claimed. Instead, each of the five steps recited in claim 1 of the '159 Patent is described only at a high level of generality as "obtaining a photographic image," "processing . . . the photographic image . . . to extract a code pattern," "decoding the extracted code pattern," "transmitting a content information request message to a server," and "receiving content information from the server."

To accomplish these steps, claim 1 recites the use of a "user terminal," a "processor," and a "server." But the claimed "user terminal" can be virtually any device capable of taking a photograph. *Id.* at 8:47-50, 8:61-63. All that is required to "process the image to extract a code pattern" is "[a] scanner, a PC camera, a digital camera, a Web camera or the like" (*id.* at 10:14-17), and either "a one-dimensional or two-dimensional code recognizer" is used to "decod[e] the extracted pattern" (*id.* at 10:20-23). The claimed "server" merely performs basic functions of a conventional web server like receiving information (such as a URL or HTML request) and rendering a webpage. *Id.* at 8:64-9:5.

The applicants' own characterizations demonstrate that the claimed components do not "improve the functioning of the computer itself" (*Alice*, 134 S. Ct. at 2359), for example by disclosing an "improved, particularized method of digital data compression" (*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014)), or improving "the way a computer stores and retrieves data in memory" (*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016)). For example, in *Enfish*, the Federal Circuit distinguished the claims from others that "simply add[ed] conventional computer components to well-known business practices," holding instead that "they [we]re drawn to a specific improvement to the way computers operate." *Id.* at 1336. In particular, the unconventional structure of the database resulted in "increased flexibility, faster search times, and smaller memory requirements." *Id.* at 1337. Unlike *Enfish*, nothing in

claim 1 of the '159 Patent shows any unconventional methodology that would amount to a "specific improvement in the way computers operate." Rather, claim 1 is directed to automating a pre-computer business practice, which is ineligible under *Alice. See Bancorp*, 687 F.3d at 1278-79 ("the fact that the required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter. . . . the computer simply performs more efficiently what could otherwise be accomplished manually."). Therefore, the focus of the '159 Patent is not "on [a] specific asserted improvement in computer capabilities" but instead "on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *See Enfish*, 822 F.3d at 1336.

There is simply nothing "inventive" about using a known process (i.e., decoding a barcode) to access a website. *See Secured Mail*, 873 F.3d at 912. Moreover, the abstract functional descriptions in claim 1 are devoid of any technical explanation as to how to implement the purported invention in an inventive way. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 615 (Fed. Cir. 2016) (claims failed *Alice*'s step 2 where specification limited its discussion of "additional functionality" of conventional components "to abstract functional descriptions devoid of technical explanation as to how to implement the invention"). Similar to the invalidated claim in *Recognicorp*, nothing in claim 1 "'transforms' the abstract idea of decoding (i.e., recognizing) information into patent-eligible subject matter." 855 F.3d at 1328 (citing *Alice*, 134 S. Ct. at 2357).

Courts have repeatedly held that the presence of generic hardware and software like the kind recited in claim 1 of the '159 Patent does not make an otherwise abstract idea patent-eligible. *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Content Extraction*, 776 F.3d at 1348 ("At most, [the] claims attempt to

limit the abstract idea of recognizing and storing information from hard copy documents using a scanner and a computer to a particular technological environment. Such a limitation has been held insufficient to save a claim in this context."); *Bancorp*, 687 F.3d at 1276-77. In addition, an "abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as [mobile services]." *Intellectual Ventures I LLC v. Capital One Bank U.S.A.,* 792 F.3d 1363, 1366 (Fed. Cir. 2015).

This case is thus unlike *Berkheimer*, where the Federal Circuit noted that the specification explicitly "describe[d] an inventive feature that store[d] parsed data in a purportedly unconventional manner." *Berkheimer v. HP Inc.,* 881 F.3d 1360, 1369 (Fed. Cir. 2018). The Federal Circuit then examined whether the improvements described in the specification were included in the claims. For those claims where the inventive feature in the specification was "captured in the claims," the Federal Circuit found a "factual dispute regarding whether the invention describe[d] well-understood, routine, and conventional activities." *Id.* But where the claims did not recite the purportedly inventive features described in the specification, the Federal Circuit concluded that they were directed to patent ineligible subject matter under § 101. *Id.* Here, in contrast, there is no need for fact discovery at all because neither the claims nor the specification describes any unconventional components or the use of generic components in some unconventional manner. The claims therefore fail *Alice*'s second step because they contain no inventive features, and no amount of fact discovery can change that.

As discussed above, the purported point of novelty of the '159 Patent is the ***result*** of providing a "convenient" way for users to obtain a URL in order to access a company's website ('159 Patent at 1:32-35), but claim 1 of the '159 Patent does not describe any particular non-conventional ***mechanism*** for achieving the result. The recited limitations—whether considered

individually or as an ordered combination—are insufficient to add "significantly more" to the abstract idea. Because it is altogether devoid of any "inventive concept," claim 1 of the '159 Patent is thus patent-ineligible under § 101. *See Alice*, 134 S. Ct. at 2359-60.

3.     **The Remaining Claims Are Also Abstract**

The remaining asserted claims of the '159 Patent relate to the same abstract concept of recognizing and retrieving information associated with a pattern. The only differences are immaterial in the context of a § 101 analysis and relate to (i) the type of content received (i.e., "image, sound, moving picture, or text data"); (ii) the type of information extracted from the image (i.e., a "URL"); and (iii) additional generic components (e.g., a "transceiver" for transmitting and receiving information and "[a] non-transitory machine-readable storage medium, having encoded thereon program code"). *See, e.g.*, '159 Patent at cls. 2, 3, 8, 9, 10, 15, 16. But specifying the type of content that is received or extracted is a token or insignificant pre-solution activity insufficient to transform the abstract idea into patent-eligible subject matter. *See Mayo*, 132 S. Ct. at 1297-98, 1300-01. So too is the claims' identification of additional generic components—particularly since there is no disclosure of how any of the generic components (e.g., "transceiver") must be configured in any "inventive" manner in order to accomplish the desired results. *See Internet Patents*, 790 F.3d at 1348.

The unasserted claims fare no better. For example, the unasserted claims of the '159 Patent include the additional limitations (i) that the server retrieves information from a database and returns that information to the user terminal (claims 4, 11, 17); (ii) that specifies the type of information sent to the server (claims 5, 12); and (iii) regarding the type of information retrieved from the database (claims 6, 7, 13, 14).

None of these additional features amounts to an inventive feature or renders the claims any less abstract. Regardless of their form, therefore, all of the claims of the '159 Patent fail both

prongs of *Alice* because they are directed to an abstract idea and recite no inventive concept. *Alice*, 134 S. Ct. at 2355, 2357.

### D. The Disproportionate Risk of Preemption Confirms that the Claims Are Abstract

Because the claimed method and system can be implemented using virtually any device capable of taking a photograph (e.g. a smartphone), any process capable of converting an analog image to a digital format (e.g. a scanner), any process capable of reading digital information (e.g., a standard code recognizer), and any conventional server capable of sending and receiving information, the '159 Patent risks preempting *all* automated methods or systems for data recognition and retrieval. *See, e.g.*, *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 843 (E.D. Tex. 2014) (finding "preemptive effect . . . broad" where "the claims [were] largely functional in nature, they [did] not provide any significant description of the particular means by which the various recited functions are performed," and "[a]ll that [was] disclosed [was] the ultimate objective"). Therefore, the claims implicate the same preemption concern undergirding the § 101 analysis and should be found ineligible.

## V. CONCLUSION

For the foregoing reasons, Cold Stone Creamery respectfully requests that the Court dismiss Coding Technologies' Complaint for improper venue, or, alternatively, for failure to state a claim upon which relief can be granted. Because leave to amend would be futile, Cold Stone Creamery requests dismissal with prejudice.

Dated: July 12, 2018

Respectfully submitted,

**FISH & RICHARDSON P.C.**

By: */s/ Ricardo J. Bonilla*
  Neil J. McNabnay
  Texas Bar No. 24002583
  mcnabnay@fr.com
  Ricardo J. Bonilla
  Texas Bar No. 24082704
  rbonilla@fr.com
  Theresa M. Dawson
  Texas Bar No. 24065128
  tdawson@fr.com
  1717 Main Street, Suite 5000
  Dallas, Texas 75201
  (214) 747-5070 – Telephone
  (214) 747-2091 – Facsimile

**COUNSEL FOR DEFENDANT
COLD STONE CREAMERY, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on July 12, 2018, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

        */s/ Ricardo J. Bonilla*
        Ricardo J. Bonilla

## DEFENDANTS' NOTICE OF COMPLIANCE WITH THE COURT'S
## 35 U.S.C. § 101 MOTION PRACTICE ORDER

Pursuant to the Court's 35 U.S.C. § 101 Motion Practice Order, lead counsel for

Defendant Cold Stone Creamery, Inc., and lead counsel for Plaintiff Coding Technologies, LLC

conferred on July 10, 2018, regarding the need for claim construction to resolve the § 101 issues

in these cases, and the undersigned hereby certifies the following:

  __X__ The parties agree that prior claim construction is not needed to inform the Court's
        analysis as to patentability.
  _____ The parties disagree on whether prior claim construction is not needed to
        inform the Court's analysis as to patentability.


*/s/ Ricardo J. Bonilla*_____
Ricardo J. Bonilla